UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:19-cr-00103-TWP-DLP-5 |
| | ) |
| MATTHEW SMITH, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States hereby submits this Sentencing Memorandum regarding defendant Matthew Smith (the "defendant" or "M. Smith"). As the government demonstrated at trial, M. Smith, first as a co-founder of Banc-Serv Partners, LLC ("Banc-Serv"), and then as a director of a non-bank SBA lender called Bridge Business Bancorp (BBB), participated in a fraud scheme by which he and his co-defendants lied on loans guaranteed by the Small Business Administration ("SBA") and caused the resubmission of those lies to the SBA to induce it to pay out on those guarantees.

The United States respectfully requests that this Court: (1) calculate the defendant's Total Offense Level at 27; (2) impose a sentence of 48 months' imprisonment for M. Smith's conviction for Count 1; and (3) impose a three-year term of supervised release.

## FACTUAL SUMMARY

M. Smith, along with his then-wife, Kerri Agee ("Agee"), founded Banc-Serv in or around March 2002. He worked there until 2006, when he left to start BBB. At BBB, he worked with Banc-Serv to originate loans as one of the company's lending clients. In both of his roles, he participated in a scheme to defraud the SBA—a scheme that caused the SBA to pay millions to

honor guarantees on loans it never would have issued in the first place had it been aware of the defendant and his co-conspirator's lies and misrepresentations.

Banc-Serv was an SBA lending service provider, meaning it originated, packaged, serviced, and liquidated loans on behalf of banks. Banc-Serv employees corresponded on behalf of their client banks with the SBA. In the event of a default, Banc-Serv, not the bank, often put together the required documents and submitted the package to the SBA, and worked with the SBA to resolve any issues that arose.

Through both of his roles, M. Smith was on the front-line of the scheme to defraud the SBA. He worked directly with borrowers to originate loans he knew to be ineligible for an SBA guarantee, and then when he went to BBB, he worked directly with his former colleagues from Banc-Serv to do the same. Guided by co-defendant Agee and in conjunction with co-defendant Chad Griffin ("Griffin"), he helped falsify loan documents to ensure the SBA would not discover that the loans he was helping originate did not qualify for SBA guarantees.

Starting in or around 2004, M. Smith and his co-defendants began their scheme to lie on SBA loan applications in order to obtain the valuable SBA loan guarantees. The loan documents and bank records showed that for the Rodgers Finishing Tools loan working capital loan proceeds had been used to repay a $50,000 equity injection. (**Ex. 118:6, 14, 143, 153**; **Ex. 303:11**.) Furthermore, Brad Crawford testified that he was advised that the working capital amount would be paid by the loan proceeds, and he only needed to bring a check to the closing of the loan, even though he did not have the funds to back that check, by Agee on a call between himself, Agee, and M. Smith. (ECF No. 268, at 993-95). This fake equity injection made the loan ineligible for an SBA guarantee, as the equity injection was a necessary condition to get the loan. (Testimony of Frank Pucci, ECF No. 270, at 1385).

In the Touchton Industries loan, M. Smith worked with Griffin to conceal the use of loan proceeds to pay past-due payroll taxes through a bridge loan from BBB. After Griffin was explicitly told by the SBA that loan proceeds could not be used to pay past-due payroll taxes, Griffin reassured SBA staff that the past payroll taxes would be paid off with a line of credit from BBB (**Ex. 140**). M. Smith then designed the bridge loan structure that Griffin used to close the loan. (**Ex. 125**). They then directed working capital proceeds to be used to pay off the bridge loan, despite knowing that debt could not be refinanced unless it had been used for an eligible purpose. (**Ex. 125, 126:94**). This prohibited form of refinancing was a preferred loophole for M. Smith and his co-defendants at Banc-Serv. Indeed, in the Advance Pharmaceutical loan proposal, co-defendant Kelly Isley ("Isley"), copying M. Smith, proposed using a bridge loan to conceal payment of a government fine. (**Ex. 13**).

In the Larson Cement loan, M. Smith, working with co-defendants Agee and Griffin, originated a $1.2 million loan by BBB while disguising a $770,342.31 payment of past-due payroll taxes as working capital. (**Ex. 56, 63, 64**). Recognizing that this payment was prohibited, Griffin wrote in an email to BBB, copying M. Smith and Agee, "The SBA will not let us pay back taxes with loan proceeds," instead proposing that the "use of the proceeds in the write-up [] say the funds . . . are for working capital." (**Ex. 56**). Before the loan closed, Sandy Oh, who worked with M. Smith at BBB, proposed that they use a bridge loan to pay off Larson's past-due payroll taxes. (**Ex. 57**). Kerri responded to Oh, copying Griffin and M. Smith, "Per Matt we are going to move forward with the current SBA application as is and try to do everything simultaneously that the loan would close as originally planned." The loan closed exactly as proposed. (**Ex. 63**). Importantly, neither of these borrowers were even eligible for an SBA guarantee because they were in arrears on their payroll taxes.

While the above establishes that M. Smith was not a limited participant in the scheme, there is even more to his role. The First Foliage loan, which was not featured at trial, but which the Government has learned about since, further demonstrates that M. Smith's involvement in the fraud was not an aberration. In that loan, originated in mid-2009, M. Smith helped obtain a guarantee for a $2 million loan made by Bank of America to a business in Florida, the proceeds for which were to be used to pay down pre-existing debt. Yet, just like other loans, they disguised the payoff as working capital. *See* Exhibits A & B. M. Smith made a $100,000 consulting fee from this loan alone. *See* Exhibit C. When the SBA discovered that proceeds had not been used as authorized, it refused to honor its 75% guarantee and Bank of America had to repay the SBA $1.42 million it had initially paid out. *See* Exhibit B.

The other fraudulent loans M. Smith was not directly involved in were reasonably foreseeable to him as part of his involvement in the conspiracy. Co-defendants Agee, Isley, and Nicole Smith resubmitted a loan application for Rec Room under a fabricated name after the SBA denied the initial application because the borrower exceeded the SBA's size limits. (**Ex. 103, 105:4, 111**). The defendants repeatedly lied to SBA officials about when the borrower's affiliate business had closed. (**Ex. 107, 315**). The defendants' decision to resubmit the Lithocraft loan under the Express program was similarly driven by a desire to bypass the SBA's decision that the borrower, Dennis Evans, was not creditworthy. (**Ex. 80, 81**). The Indiana Baseball Academy loan involved similar misrepresentations in which co-defendant Agee disguised prohibited debt payoffs as working capital. (**Ex. 33:125, 36:2, 420**). All four loans involved the same types of misrepresentations and concealments in which M. Smith directly participated.

While M. Smith was not involved in the liquidation of SBA loans, such conduct was an integral and foreseeable part of the conspiracy that he joined. Because Banc-Serv was hired to

4

obtain SBA loan guarantees for banks, Banc-Serv stood to lose business and money if the SBA discovered the guarantees were invalid and refused to honor them. (**Ex. 141, 142**). Indeed, Brad Crawford and Stacy Allan testified that Banc-Serv boasted to its clients that it had never lost a guarantee. Stacy Allan, who worked in Banc-Serv's liquidations department, testified that she would gather the documents sitting in Banc-Serv's files when she prepared the packages of documents requesting that the SBA honor its guarantees—the same documents that M. Smith had helped fraudulently create on the front end.

On August 4, 2021, the jury returned guilty verdicts against all five defendants. M. Smith was convicted of one count of conspiracy to commit wire fraud. (ECF No. 234).

## **GUIDELINES CALCULATION**

The second revised final presentence investigation report ("PSR") recommends that the Total United States Sentencing Guidelines ("USSG" or "Guidelines") Offense level for defendant is 27. ECF No. 320, ¶ 101. The United States concurs with the enhancements contained in the report, however it objects to the calculation of loss in the PSR, as it does not include loans that were reasonably foreseeable to M. Smith.

1. Base offense level, §2B1.1(a)(1)        7
2. Loss, §2B1.1(b)(1)(I)                   +16
3. Sophisticated Means, §2B1.1(b)(10)(C)   +2
4. Abuse of Position of Trust, §3B1.3      +2

TOTAL OFFENSE LEVEL                        **27**

The defendant, along with her co-defendants, objects to several portions of the PSR, including many of the enhancements therein. (ECF No. 274.) Specifically, the defendant argues:

1. No enhancement for loss is appropriate because the defendant's actions were not the

legal cause of the SBA's loss;

2. The inclusion of the loan to Katera's Kove in the loss amount is inappropriate;

3. If loss is to be included, the proper calculation is $250,000, based on just the specific amounts associated with the fraudulent portions of each loan at issue;

4. Against the application of restitution;

5. That the conduct of the scheme was not sophisticated, and the enhancement for sophisticated means is not appropriate;

6. That there was no trust relationship between the SBA and Banc-Serv, so the abuse of a position of trust enhancement should not be applied.

The United States will address each of these objections after addressing its own objection to the loss calculation.

### A. The Loss and Restitution Attributable to M. Smith is $2,111,756.30

Under the Guidelines, Relevant Conduct in the case of jointly undertaken criminal activity, a defendant is responsible for the conduct of others that was "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction . . . ." U.S.S.G. §1B1.3(a)(1)(B). The United States argues that the following loans should apply to the loss calculation:

| Loan | Actual Loss |
|---|---|
| Rodgers Finishing Tools | $966,428 |
| Rec Room | $176,803 |
| Larson Stone & Cement | $92,904.30 |
| Lithocraft (-5009) | $14,836 |
| Indiana Baseball Academy | $268,667 |

| Touchton Industries | $592,118 |
|---|---|
| **Total** | 2,111,756.30[1] |

The loss calculated in the PSR did not include Rec Room, Lithocraft, or Indiana Baseball Academy. It is undisputed that those loans were part of the fraudulent scheme elicited at trial and for which the defendants, including M. Smith, were convicted, and that the fraud on these loans were in furtherance of that criminal scheme. Therefore, the only remaining question is whether the fraudulent conduct on these loans was reasonably foreseeable to M. Smith.

The fraud on the loans at issue—Rec Room, Lithocraft, and Indiana Baseball Academy—all share a *modus operandi* with the fraud on the loans that M. Smith personally participated in. All three of them involved the pushing of ineligible expenses into the working capital category—the hallmark of the fraud on Larson Cement, Touchton Industries, and Rodgers Finishing Tools. Additionally, Rec Room and Lithocraft went to the basic eligibility of the loans because they were about the size limit of small businesses (Rec Room) and the basic creditworthiness of the borrower (Lithocraft). That is similar to the issue with all three of the loans M. Smith was personally involved in, all of which were about the basic eligibility of the borrower. Additionally, while not in the trial record, M. Smith's involvement in the First Foliage loan, in which working capital was used to pay off preexisting debt, shows that the conduct on Rec Room, which involved paying off affiliate debt with working capital funds, and the conduct on Indiana Baseball Academy, which involved the payment of student debt with working capital money, was foreseeable to M. Smith.

For those reasons, it is clear that the fraud on those three loans was reasonably foreseeable to M. Smith, and the United States's objection should be sustained.

---

[1] The United States is excluding the two Lithocraft loans with the missing environmental questionnaire because the decision to falsify that document was not reasonably foreseeable to M. Smith.

### B. The Defendants Were the Legal Cause of the SBA's Loss

The SBA's loss in this case was directly caused by the Defendants' conduct, including M. Smith's conduct, and is therefore properly calculated in the PSR.

The Seventh Circuit has found that when a defendant's fraud contributes to victims' decision to put an amount of money at risk, that amount reflects what is actually taken by fraud for purposes of determining loss under Sentencing Guidelines. *United States v. Morris*, 80 F.3d 1151, 1173-74 (7th Cir. 1996). That other factors may have contributed to a loan's default does not exclude it from the loss calculation. *See United States v. Miller*, 962 F.2d 739, 743-44 (7th Cir. 1992) (rejecting argument in HUD loan fraud case that defendants "cannot be held accountable for any losses if those losses were directly caused by others").

Current and former SBA employees who testified at the trial, including the former director of the Loan Guaranty Processing Center, the office that approved most of the loan applications at issue in this case, told the jury that had the SBA discovered the defendants' lies, the guarantees would not have been issued at all. Frank Pucci, the former SBA center director, reviewed emails from several of the loans at issue in this case, and in each instance, he confirmed that had the SBA known about the deception, the authorization would have never been issued, because in addition to the specific use of proceeds being a violation of SBA rules, the effort to hide the ineligible expenses goes to the very integrity of the SBA lending program. *See, e.g.*, Testimony of Frank Pucci, ECF No. 270 at 1433. Janel Newbold testified that had the SBA known about the intentional deception in obtaining the guarantee, or an intentional scheme to subvert the SBA's requirement, then the entire amount of the guarantee would have been denied, and the bank would suffer the full loss on the balance of the loan. ECF No. 269 at 1194-96, 1201, 1229-1230.

Additionally, while the defendants argue that the SBA should have taken steps to mitigate its losses, they fail to identify what steps the agency should have taken, and how they may have been effective in uncovering the lies that were being told to them. In several instances throughout the trial, the SBA identified problem areas on loans being originated by Banc-Serv, and in each of those instances, the defendants came up with different ways to evade the SBA's detection. For example, on the loan to Ace Precision, after the SBA identified the issue with the ownership change, the defendants simply created a fake name for the company and resubmitted the loan in order to avoid detection. (**Ex. 1, 3, 4, 6, 7, 8**). On the loan to Touchton Industries, after the SBA raised an issue with the payment of past-due payroll taxes, the defendants arranged for a bridge loan to pay off the ineligible taxes and then used the working capital proceeds to pay that bridge loan. (**Ex. 125**; **Ex. 126:91, 94**; **Ex. 139:1, 23**; **Ex. 140:1, 3**). On the loan to Rec Room, the defendants concealed the affiliate business from the SBA by, again, changing the name of the company to avoid detection. (**Ex. 103, 105:4, 111**). The defendants repeatedly lied to SBA officials about when the borrower's affiliate business had closed. (**Ex. 107, 315**). To suggest that the victim of deceit should have known they were being defrauded is impermissible victim blaming. *See Miller*, 962 F.2d at 744 ("A victim's failure to mitigate or the negligence of intervening actors does not prevent attributing to the defendants the full amount of loss."). As such, this objection should be overruled.

**C. Katera's Kove Should not be Included in the Loss Calculation**

The United States agrees with the defense objection that Katera's Kove should not be included. In the second revised PSR, this loan has been removed. As discussed above, the United States believes the proper loss calculation is as follows:

9

| LOAN | LOSS |
|---|---|
| Rodgers Finishing Tools | $966,428 |
| Rec Room | $176,803 |
| Larson Stone & Cement | $92,904.30 |
| Lithocraft (-5009) | $14,836 |
| Indiana Baseball Academy | $268,667 |
| Touchton Industries | $592,118 |
| **TOTAL** | $2,111,756.30[2] |

### D. The Proper Calculation of Loss is the Full Amount of Loss Suffered by the SBA

As discussed above in response to the first objection, the proper calculation of loss is the full loss suffered by the SBA on each loan because (1) most of the borrowers were ineligible for any SBA guaranteed loan and (2) the SBA would not have paid out on the guarantees at all had it know it was deceived. Therefore, this objection should also be overruled.

Loss should not be limited solely to the amount misappropriated. The principle the defendants invoke comes from the Government Benefits Rule, captured in commentary note 3(F)((ii) of USSG § 2B1.1, which states that "[i]in a case involving government benefits (*e.g.*, grants, loans, entitled program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses . . . ." The note requires the court to ask what the borrower would have been entitled to had the defendants been truthful in preparing the guarantee applications and the requests to the SBA to honor the guarantees. *See United States v. Tupone*, 442 F.3d 145, 154 (3d Cir. 2006) (loss for government benefits is "difference between the amount of benefits actually obtained by a given defendant and

---

[2] The loss amounts the Government is including on this table for the Larson and Touchton loans is lower than the pay-out amount reflected on **Ex. 218** because the loss amounts have been reduced by recoveries the SBA has made in the interim.

10

the amount the government intended him to receive during the relevant period"). The answer is nothing.

First, most of the borrowers had disqualifying conditions that had they been disclosed would have made them—and the banks' loans to them—ineligible for a guarantee. Touchton Industries and Larson Cement were not current on their payroll taxes. The principals of Rodgers Finishing Tools did not have the funds for a $50,000 equity injection. Rec Room exceeded the SBA's size limits. The owner of Lithocraft had bad credit. As such, none of them could properly obtain a guarantee. This result is consistent with the Seventh Circuit's decision in *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), which held that the proper calculation of loss for a fraudulently obtained government contract reserved for a minority business was the entire value of the contract (rather than the value of the contract minus the value of the work performed), because the defendants were not proper recipients of any amount of the contract. *Id.* at 790.

Second, once the guarantee was fraudulently or improperly obtained, a truthful disclosure on the back-end, as Janel Newbold testified, would likely result in a complete denial of payment by the SBA, and the banks would suffer a full loss on the balance of the loan. In other words, the SBA intended that the banks—the actual parties with whom the SBA had a contractual relationship—receive no benefit.

### E. Restitution is applied correctly

Restitution is properly applied in this case, but, as outlined above, the amount should include the losses from Rec Room, Indiana Baseball Academy, and the Lithocraft loan ending in x5009, for a total of $2,111,756.30.

## F. Sophisticated Means is Properly Applied

The defendants engaged in a long-running, sophisticated scheme to defraud the SBA. Several times in this case, the defendants used fake business names to conceal material information from the SBA in order to push loans through. (*See* Ace Precision, **Ex. 1, 3, 4, 6, 7, 8**; Rec Room, **Ex. 103, 105:4, 111**). M. Smith was the one who came up with the bridge loan structure on Touchton Industries (**Ex. 125**). This was the structure by which the defendants could hide the illicit scheme from the SBA by having M. Smith's sham company issue a loan that would be temporarily used to pay off the past-due payroll taxes, and which itself would be paid off by the SBA loan. Additionally, as outlined in the PSR, this is scheme that continued for more than a decade, and it required careful concealment of illegal activities. ECF No. 312 at 43.

## G. Defendant Abused the Trust of the SBA

The Defendants incorrectly characterize the relationship between Banc-Serv and the SBA as arm's length. In fact, Banc-Serv was standing in the shoes of the lending banks who had a trust relationship with the SBA. The SBA employees testified about the trusting relationship between the lender and the SBA. ECF No. 265 at 110-12 (Hendrix); ECF No. 266 at 317, 328 (Serrano); ECF No. 270 at 1433, 1510 (Pucci). SBA employee Theresa Hendrix testified that the SBA expected the Lender Service Providers to follow all the rules and regulations of the SBA, not just the lenders. ECF No. 265 at 112. Banc-Serv's entire business model was to take over all the interactions with the SBA on behalf of the bank because they had the expertise. SBA employee Janel Newbold testified that it was common for the SBA to work exclusively with lender service providers, instead of lenders themselves. ECF No. 269 at 1189. Because the SBA interacted directly with lending service providers and lenders rather than borrowers it was not set up at the time to detect fraud. ECF No. 370 at 1513-14. This trusting relationship "contributed in [a]

significant way to facilitating the commission [and] concealment of the offense" because the SBA did not closely scrutinize lenders' submissions for false statements. U.S.S.G. § 3B1.1 cmt. note 1. Additionally M. Smith had an even more direct trust relationship with the SBA, as he started a lending company that directly made SBA-guaranteed loans.[3]

This was not an arm's length relationship, but one in which the SBA expected the defendants to follow the rules and originate, service, and liquidate loans in good faith with minimal oversight by the SBA. Defendant M. Smith abused that trust by lying on loan applications, so the enhancement is properly applied.

## SENTENCING FACTORS

Title 18, United States Code, Section 3553(a) enumerates several factors that the Court shall consider in sentencing the defendant. As discussed below, the factors weigh in favor of a significant sentence. However, given the particular nature of this crime, the United States is recommending a slight downward variance that would still result in a significant term of imprisonment from the Guidelines as calculated above.

**(1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The defendant engaged in a fourteen-year scheme to defraud the SBA by frustrating the central purpose of the agency—to provide guaranteed loans to qualifying small businesses. The defendant was a loyal and willing participant in this scheme. He caused the submission of loans that he knew violated SBA rules and for which the borrowers were not eligible for SBA-guaranteed funds. Though he left Banc-Serv early in the scheme, he started another company and worked

---

[3] The PSR has alleged that the alternative basis for this enhancement—use of a special skill—should apply instead of Abuse of a Position of Trust. Undoubtedly, M. Smith also used a special skill in his job as a lender to defraud the SBA. In either situation, the enhancement should apply.

13

with Banc-Serv to commit this same fraud.

However, the evidence introduced at trial showed that Banc-Serv's loan portfolio involved a significant number of loans, and only a small percentage were shown to be fraudulent. Banc-Serv was a company that did a large amount of legitimate business with the SBA, as opposed to being a company that was mostly originating fraudulent loans. Additionally, M. Smith's compensation does not appear to have been tied to the fraudulent scheme in any significant way. Additionally, while the scheme continued for fourteen years, the affirmative misrepresentations were largely made in the first six years of the conspiracy. As such, and in addition to the need to avoid unwarranted sentencing disparities, as discussed below, the United States is recommending a variance from the low end of the Guidelines range as calculated by probation. M. Smith's personal characteristics, as outlined in the PSR, neither suggest a variance is warranted, nor do they suggest one would be inappropriate.

In or around 2016, M. Smith provided some information to federal agents about Banc-Serv, but more specifically about Defendant Agee. However, at no point did he disclose any of the fraud that he committed on any of the loans at issue in this trial. Whatever M. Smith's motives were to report issues he saw with Defendant Agee and Banc-Serv, he never met the first requirement of anyone who wants to cooperate with the United States—coming clean about his own involvement. As such, this aborted attempt at cooperation is not grounds for a variance.

**(2) The need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with appropriate education or vocational training**

Within this factor, the first two subfactors suggest that a significant term of incarceration after a small variance would be a sentence that is no longer than necessary to satisfy the aims of the statute. As outlined above, the offense is incredibly serious, as the Small Business Administration is using taxpayer money to provide loans to qualifying businesses, and it therefore has a significant interest in ensuring that its lenders and lender service providers are following the rules. Additionally, a significant term of imprisonment is needed to deter future potential wrongdoers from cutting the types of corners the defendant cut at Banc-Serv in order to push loans through that did not qualify.

Based on the information found in the PSR, defendant does not appear to have a specific need for educational or vocational training, nor is there a reason to believe that the public would need protection from the defendant in the future.

**(3) The need to avoid unwarranted sentencing disparities**

On December 6, 2021, this Court sentenced Defendant Isley to a term of imprisonment of 57 months, and on December 9, 2021, this Court sentenced Defendant Agee to a term of imprisonment of 68 months. Given the relative culpabilities of M. Smith, Isley, and Agee, the United States has recommended a 48-month sentence in order to avoid the unwarranted disparity that a Guidelines sentence would result in if applied to this defendant. That recommended sentence is in line with what the United States has recommended—or what this Court has imposed—with respect to the other four defendants.

# **CONCLUSION**

For the foregoing reasons, the United States respectfully requests this Court to sentence Defendant Matthew Smith to a term of imprisonment of 48 months, followed by a three-year term of supervised release.

Respectfully submitted,

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section

Date: December 9, 2021    By: s/ Vasanth Sridharan
Vasanth Sridharan
Trial Attorney, Fraud Section
William Johnston
Assistant Chief, Fraud Section
U.S. Department of Justice, Criminal Division
1400 New York Ave. NW
Washington, D.C. 20530
Telephone: (202) 616-8479
Email: Vasanth.Sridharan@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2021, that the Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system

      *s/ Vasanth Sridharan*
Vasanth Sridharan
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave. NW
Washington D.C. 20530
Telephone: (202) 616-8479
Fax: (202) 514-0152
E-mail: Vasanth.Sridharan@usdoj.gov